**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>Cesar Arce-Hernandez,<br><br>　　　　　Defendant. | No. CR-21-01216-001-TUC-JGZ (MSA)<br><br>**REPORT AND RECOMMENDATION** |

Pending before the Court is a petition to revoke Defendant Cesar Arce-Hernandez's term of supervised release. For the following reasons, the Court will recommend that the petition be dismissed.

**I.　　Background**

In 2021, Defendant pleaded guilty to illegal reentry of a removed alien. (Doc. 29.) He was sentenced to a 24-month term of imprisonment with a 36-month term of supervised release to follow. (Doc. 40.) The judgment requires that he follow certain conditions of supervision, including mandatory condition 1: "You must not commit another federal, state or local crime." (*Id.* at 2.)

In May 2025, Defendant's probation officer filed a petition to revoke his supervised release, alleging that he had violated mandatory condition 1. (Doc. 41.) The petition alleges that, on or around May 10, Defendant committed domestic violence assault, domestic violence disorderly conduct, and domestic violence threat and intimidation in violation of Arizona law. (*Id.* at 1.) Defendant denied the allegation and proceeded to an evidentiary

hearing. (Docs. 46, 49.) At the hearing, the government called three witnesses. (Doc. 51.)

The first witness was Fabiola Peraza, the probation officer assistant who supervised Defendant. (Doc. 52 at 9–10.) Officer Peraza testified that, on May 8 and May 10, she received several text messages about Defendant from a telephone number she did not recognize. (*Id.* at 14–21.) The messages were written in Spanish and translated for the Court by Officer Peraza. (Pl.'s Exs, 1, 2.) Officer Peraza never confirmed who sent them. (Doc. 52 at 29.)

The first message on May 8 stated:

> Good afternoon. I'm the person that resides with Cesar Arce. I got this phone number from his cellphone. And I know it's from probation. About a week ago, he was using drugs and was very aggressive. I haven't been able to report it because I'm scared because he threatens me. So I learn – I – I remember the phone number. And I was able to send you the message with fear of him finding out that I reported him. I ask you to please visit – to visit him at the address soon so you can see. I also ask that you keep it confidential because I'm scared.

(*Id.* at 16.)

Officer Peraza responded later that day, advising the unnamed person to contact the police if there was an emergency and that she would see when a probation officer was available for a visit. (*Id.* at 16–17.) The person replied: "Right now, I've been surviving it. I'm honestly scared. Thank you. I will wait until someone honestly would come visit him. I don't call the police because he checks my cellphone and frightens me." (*Id.* at 17.)

Officer Peraza received additional messages on May 10. (*Id.* at 18.) The first stated:

> Good afternoon. I wanted to let you know that this is the only way of contacting you that I have. Today Cesar hit me, and I run to hide in the restroom. I don't call the police because he has threatened with my family. He says that he's going to kill me, and I'm very scared. I beg you – I beg you to help me.

(*Id.*)

The second provided the unnamed person's home address. (*Id.* at 18–19.) About 90 minutes later, Officer Peraza saw the messages and contacted the Eloy Police Department. (*Id.* at 19–20.) She exchanged a few more messages with the unnamed person when the

- 2 -

1  police arrived, including a message asking Officer Peraza to "keep it in secret, because [the
2  person was] scared." (*Id.* at 20–21.) Shortly thereafter, Officer Peraza was informed by an
3  Eloy police officer that Defendant would be arrested. (*Id.* at 22.) Based on that information,
4  Officer Peraza filed the petition to revoke. (*Id.*)

5        The second witness was Eloy Police Department Officer Quentin Slaughter. Officer
6  Slaughter testified that, on May 10, he was dispatched to a residence because of a possible
7  domestic violence incident. (*Id.* at 37.) He and a fellow officer were outside the house for
8  a few minutes before a woman came outside. (*Id.* at 39.) The woman, later identified as
9  Anahi, spoke in Spanish to the other officer for a brief time before walking back into the
10 house. (*Id.* at 39, 41.) Officer Slaughter does not speak Spanish and did not understand the
11 conversation, but he observed that Anahi looked "kind of nervous." (*Id.* at 39.) Anahi
12 eventually went back outside, this time accompanied by Defendant and two other women
13 (Sonia and Guadalupe). (*Id.* at 41, 44.) The other officer told Officer Slaughter that Anahi
14 had stated that "Cesar hit Sonia, and she's not going to admit it." (*Id.* at 42.)

15       Officer Slaughter saw that Anahi "was very nervous" and "not wanting to say a lot,"
16 so he took her away from the others to talk. (*Id.* at 42.) As they got further from Defendant,
17 he noticed that Anahi "stopped looking around a lot" like she was "scared for [her] life."
18 (*Id.* at 44.) The two communicated using a translation application on Officer Slaughter's
19 phone. (*Id.* at 42–44.) According to Officer Slaughter, Anahi reported that "she was scared
20 for her life against Cesar" because she had "observed Cesar hit Sonia." (*Id.* at 44.) She
21 further reported that Defendant had threatened to "drag" her and Guadalupe "out to the
22 desert and kill them if they called the police." (*Id.* at 45.) Anahi estimated that Defendant
23 had hit Sonia about 30 minutes before the police arrived. (*Id.*)

24       Officer Slaughter then talked with Guadalupe through the translation application.
25 (*Id.* at 46.) He testified that Guadalupe "said pretty similar things," including that "[s]he
26 was afraid for her life" because Defendant had threatened to "drag them both out to the
27 desert and kill them." (*Id.*)

28       The final witness was Eloy Police Department Officer Jesus Rodriguez. Officer

- 3 -

Rodriguez, who speaks Spanish, testified that Anahi came outside the house stating that there were "people inside" and that she would "get them." (*Id.* at 55–56.) He testified that, after she brought everyone out, they all denied that something had happened. (*Id.* at 56.) As he talked to Defendant, he noticed that Anahi and Sonia looked "kind of scared" and were avoiding eye contact with him. (*Id.* at 57.) Anahi approached Officer Rodriguez and whispered that Sonia was "a victim" but would not "talk unless Cesar is away from here." (*Id.*) Officer Rodriguez then detained Defendant in a patrol vehicle while he spoke to Anahi and Sonia. (*Id.* at 59–60.)

Anahi told Officer Rodriguez that "Sonia and Cesar were involved in an argument over a TV antenna when Cesar struck Sonia in the face with an open hand," and that Sonia "got scared" and hid in the restroom. (*Id.* at 58.) Sonia confirmed to Officer Rodriguez that Defendant had struck her in the face. (*Id.* at 59.) Sonia added that Defendant had assaulted her on "multiple occasions," that she had "learned to live with it," and that "she was there for him" and "willing to take him back." (*Id.* at 59–60.) In addition, Anahi and Sonia both reported that Defendant had threatened to "tak[e] them to the desert and kill[] them if they call[ed] police." (*Id.* at 61.) Officer Rodriguez observed that Sonia "was more open and willing to talk" once Defendant had been taken into custody. (*Id.* at 60.)

After Officer Rodriguez's testimony, the parties presented their closing arguments. (*Id.* at 65–81.) The Court then took the matter under advisement. (*Id.* at 82.)

**II.    Legal Standard**

A district court may revoke a defendant's term of supervised release if the defendant violates a condition of his supervision. 18 U.S.C. § 3583(e)(3). The government must prove the violation by a preponderance of the evidence. *United States v. Turner*, 312 F.3d 1137, 1142 (9th Cir. 2002).

**III.   Discussion**

The petition's lone allegation (Allegation A) is that Defendant violated mandatory condition 1 by committing domestic violence assault, domestic violence disorderly conduct, and domestic violence threat and intimidation. The Court finds, as a threshold

matter, that reliance on the government's hearsay evidence would violate Defendant's right to confront the witnesses against him. Considering only the nonhearsay evidence, the Court further finds that the government has not proved the alleged violation by a preponderance of the evidence.

      **A.    Reliance on the government's hearsay evidence would violate Defendant's right to confront the witnesses against him.**

Defendant "enjoys a due process right to confront witnesses against him during his supervised release proceedings." *United States v. Hall*, 419 F.3d 980, 986 (9th Cir. 2005); *see* Fed. R. Crim. P. 32.1(b)(2)(C) (providing that the defendant is entitled to "question any adverse witness unless the court determines that the interest of justice does not require the witness to appear"). This right "ensures that a finding of a supervised release violation will be based on verified facts." *United States v. Comito*, 177 F.3d 1166, 1170 (9th Cir. 1999). "To determine 'whether the admission of hearsay evidence violates the releasee's right to confrontation in a particular case, the court must weigh the releasee's interest in his constitutionally guaranteed right to confrontation against the Government's good cause for denying it." *Hall*, 419 F.3d at 986 (quoting *Comito*, 177 F.3d at 1170).

The government argues that Defendant's confrontation rights are not implicated because the hearsay evidence is nontestimonial in nature. (*Id.* at 67–69.) However, hearsay evidence used at a revocation hearing is subject to the balancing test regardless of whether it is testimonial or nontestimonial. *See Valdivia v. Schwarzenegger*, 599 F.3d 984, 990–91 (9th Cir. 2010) (stating that "*both* testimonial and non-testimonial hearsay" must "fulfill[] *Comito* balancing"). The government further argues that the hearsay evidence is admissible because it satisfies the balancing test. (*Id.* at 66–67.) Defendant disagrees. (*Id.* at 74–77.) So does the Court.

The Court must first consider the strength of Defendant's interest in confronting Anahi, Guadalupe, and Sonia. The weight of such interest "depends on two primary factors: the importance of the hearsay evidence to the court's ultimate finding and the nature of the facts to be proven by the hearsay evidence." *Comito*, 177 F.3d at 1171. The importance of

the hearsay evidence in this case cannot be understated. Defendant is accused of assaultive and threatening conduct. The only evidence that he engaged in such conduct comes from Anahi, Guadalupe, and Sonia. As such, he has a strong interest in confronting them. *See id.* (concluding that the defendant "had a very strong interest" in confrontation because the hearsay evidence was the only evidence offered toward a contested element); *cf. Hall*, 419 F.3d at 986–87 (concluding that the defendant's interest was "weak" because there was "substantial" nonhearsay evidence, including testimony from a witness who saw the defendant assault the declarant, the defendant's admission to assaulting the declarant, and photographs of bruising on the declarant).

The nature of the hearsay evidence undermines the strength of Defendant's interest, but only marginally. While "[u]nsworn verbal allegations are, in general, the least reliable type of hearsay," *Comito*, 177 F.3d at 1171, the government correctly observes that there is consistency among the various statements to the officers. (Doc. 52 at 79.) For example, Anahi, Guadalupe, and Sonia each stated that Defendant hit Sonia and then threatened to kill them in the desert if they called the police. (*Id.* at 44–46, 58–59, 61.) Anahi stated that the hit occurred during an argument over a television antenna, and Defendant admitted that there had been an argument over an antenna. (*Id.* at 58, 61.) Such consistency among multiple declarants makes the statements more reliable. *See Hall*, 419 F.3d at 987–88 (finding that "the consistency with which [the declarant] reported the events of the evening to multiple people" was an indicium of reliability). However, without other corroborating evidence, that consistency weakens Defendant's interest only slightly. *See id.* (finding that, even with evidence corroborating the hearsay statement, the defendant's "otherwise strong interest in confrontation" was only "somewhat lessened").

The government argues that the May 10 text message about the assault is admissible as an excited utterance. (Doc. 52 at 67–68, 81.) Excited utterances are a "firmly rooted" exception to the hearsay rule, meaning that they "carry sufficient indicia of reliability to satisfy the reliability requirement posed by the Confrontation Clause." *White v. Illinois*, 502 U.S. 346, 355 n.8 (1992). As such, they are reliable enough to clear the lower bar set

1  by the Due Process Clause. *Hall*, 419 F.3d at 987 ("[L]ong-standing exceptions to the
2  hearsay rule that meet the more demanding requirements for criminal prosecutions should
3  satisfy the lesser standard of due process accorded the respondent in a revocation
4  proceeding."). The Court does not believe, however, that the government has shown by a
5  preponderance that the excited utterance exception applies. *See Bourjaily v. United States*,
6  483 U.S. 171, 176 (1987) (holding that the proponent of hearsay evidence must establish
7  its admissibility by a preponderance of the evidence).
8        An excited utterance is "[a] statement relating to a startling event or condition, made
9  while the declarant was under the stress of excitement that it caused." Fed. R. Evid. 803(2).
10 The statement must be made "without the opportunity to reflect on the consequences of
11 one's exclamation." *White*, 502 U.S. at 356. The government relies on the text message's
12 content to prove these requirements. (Doc. 52 at 80.) The message describes an alarming
13 event and the declarant's fear of harm, but it does not necessarily follow that the declarant
14 sent it without having an opportunity to reflect. The fact that the message explains why the
15 declarant did not contact the police suggests that the declarant considered that option before
16 deciding to contact Officer Peraza—which means that the declarant had an opportunity to
17 reflect. Further, while it is reasonable to believe that Sonia sent the message, none of the
18 officers ever confirmed that that was the case. And as far as Sonia's mental state, the record
19 shows only that she appeared "kind of scared" more than 90 minutes after the message was
20 sent. (*Id.* at 57.) In the Court's view, the foregoing does not add up to a finding that Sonia
21 sent the message while under the stress of excitement of an assault, and that she did so
22 without an opportunity to reflect.
23       As noted, the hearsay evidence is crucial to the Court's ultimate finding. This makes
24 Defendant's interest in confrontation very strong. The nature of the hearsay evidence
25 undermines that interest only slightly. "As a result, the government's 'good cause' for
26 denying confrontation must be particularly significant if it is to outweigh [Defendant's]
27 right." *United States v. Martin*, 984 F.2d 308, 312 (9th Cir. 1993).
28       The government's good cause also turns on two factors: "the difficulty and expense

of procuring witnesses and the traditional indicia of reliability borne by the evidence." *Hall*, 419 F.3d at 988 (quoting *Martin*, 984 F.2d at 312). The government has made no showing that it would have been difficult or expensive to secure the attendance of Anahi, Guadalupe, or Sonia. *Cf. id.* (finding good cause where the government's "substantial efforts to locate" the declarant were unsuccessful). And as explained above, the hearsay evidence in question is "the least reliable type of hearsay," *Comito*, 177 F.3d at 1171, that is only somewhat more reliable given its consistency. The government does argue that it has good cause for not calling Sonia because she is "deathly afraid of the situation." (Doc. 52 at 69.) Certainly, it is easy to understand why a domestic violence victim would be afraid to testify against her abuser. However, the desire to shield a victim from that difficult experience does not fit either of the caselaw factors, and the government has offered no authority holding that a defendant may be deprived of his confrontation right on that ground.

The Court finds that the government's minimal showing of good cause does not outweigh Defendant's strong interest in confronting Anahi, Guadalupe, and Sonia. As such, the Court will not consider the hearsay statements of those witnesses.

**B.    The government has not proved the violations by a preponderance of the evidence.**

Defendant is accused of committing domestic violence assault, domestic violence disorderly conduct, and domestic violence threat and intimidation. A person can commit assault by intentionally causing physical injury to another person. A.R.S. § 13-1203(A)(1). A person can commit disorderly conduct by engaging in violent behavior with intent to disturb the peace of another. *Id.* § 13-2904(A)(1). A person can commit threatening or intimidating by threatening to cause physical injury to another. *Id.* § 13-1202(A)(1). These become "domestic violence" crimes when the perpetrator and the victim have one of the relationships listed in A.R.S. § 13-3601(A), including a cohabitation relationship or a romantic relationship.

The government's evidence consists of the testimony of Officer Peraza, Officer Slaughter, and Officer Rodriguez. None of these witnesses personally observed Defendant

engaging in assaultive, violent, or threatening behavior. Thus, the Court is unable to find that Defendant committed the violations as alleged.

### IV.  Conclusion

The government has not proven Allegation A by a preponderance of the evidence. Therefore, the Court recommends that the petition to revoke (Doc. 41) be **dismissed**.

This recommendation is not immediately appealable to the United States Court of Appeals for the Ninth Circuit. The parties have 14 days to file specific written objections with the district court. Fed. R. Crim. P. 59(b)(2). The parties have 14 days to respond to objections. The parties may not file replies on objections absent the district court's permission. A failure to file timely objections may result in the waiver of de novo review. *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

Dated this 5th day of September, 2025.

_____
Honorable Maria S. Aguilera
United States Magistrate Judge